UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v. CASE NO. 6:24-cr-261-CEM-LHP

ALAN W. FILION,
a/k/a "Nazgul Swattings,"
a/k/a "Torswats V3,"
a/k/a "Third Reich of Kiwiswats,"
a/k/a "The Table Swats,"
a/k/a "Angmar," and
a/k/a "Torswats"

**UNITED STATES' SENTENCING MEMORANDUM**

For nearly 18 months, the Defendant, Alan Filion, orchestrated a staggering campaign of hundreds of violent threats and swatting attacks against victims across the United States. He targeted religious institutions, high schools, colleges and universities, businesses, and government officials. He threatened to plant bombs and commit mass shootings, with the explicit goals of provoking a violent law enforcement response, squandering scarce emergency resources, and shutting down schools and houses of worship. And he inflicted this harm for—in his own words—"money and the power trip."

For these reasons, the United States respectfully requests that the Court impose a sentence of 37 months in prison and three years of supervised release. This sentence is sufficient but not greater than necessary to reflect the seriousness of the defendant's conduct, to provide just punishment and promote respect for the law, and to deter others from engaging in this type of harmful, dangerous conduct.

## PROCEDURAL BACKGROUND

On November 13, 2024, the Defendant pleaded guilty, pursuant to a plea agreement, to an Information charging him with four counts of making interstate threats to injure the person of another, in violation of 18 U.S.C. § 875(c). Docs. 1, 19, 20. The United States agreed to recommend a sentence within the applicable guidelines range determined by the Court at sentencing, as adjusted by any agreed upon departures. *Id*. at 4-5.

The Court accepted the Defendant's guilty plea and adjudicated him guilty of the offenses on the same day. Doc. 20.

The Probation Officer prepared a presentence investigation report (PSR) and determined that, based on a total offense level of 22 and a criminal history category of I, the Defendant's advisory guideline imprisonment range is 41 to 51 months. PSR, Doc. 25 at ¶ 132.

The United States has filed a motion requesting a downward departure of three levels. If granted, the Defendant's total offense level will be 19, and his advisory guideline imprisonment range will be 30 to 37 months in prison.

## FACTS

The plea agreement sets out a detailed recitation of the facts in this case, as does the PSR, which the United States hereby incorporates. Doc. 19 at 23-40; Doc. 25 at ¶¶18-72. The undisputed facts establish that the Defendant made over 375 swatting and threat calls from approximately August 2022 to January 2024. Doc. 25 at ¶18. In many of these calls, he falsely claimed to have planted bombs or planned

mass shootings. *Id*. In other calls, he falsely claimed to have murdered someone inside a residence, baiting law enforcement and first responders to rush to the targeted residence. *Id.* at ¶ 63. The Defendant frequently told the dispatcher that he would murder any responding law enforcement officers, thereby ensuring an armed, dangerous response. *Id.*

The defendant targeted certain locations and organizations repeatedly during the course of his criminal conduct. He terrorized a high school in the Western District of Washington for six months, causing school officials, students, families, and law-enforcement prolonged apprehension. *Id.* at ¶¶31-39. After he had repeatedly targeted that high school, he made at least twenty threatening calls to other public high schools in Washington on May 10 and 11, 2023. *Id.* at ¶40. Later, in November 2023, he targeted yet another high school in Washington. *Id*. at ¶43. In February and March 2023, he targeted two high schools in Iowa. *Id.* at ¶¶42-47. In many of these incidents, he sought to frame other individuals—primarily current and former students—for making the threats. *Id.* at ¶¶31, 32, 26, 39, 40, 44.

In May 2023, the Defendant made a series of threatening calls to Historically Black Colleges and Universities across the United States. *Id.* at ¶¶53-57. In each of these calls, he claimed to have planted bombs in locations throughout the campuses, and in some of them, he made threats to murder responding law enforcement officers. *Id.* at ¶54. Consistent with his practice, he sought to frame other individuals for making these calls. *Id.* at ¶¶54, 56.

The Defendant also focused his threats on government officials and religious institutions. On one day in May 2023, he targeted three different religious institutions in the Middle District of Florida. *Id.* at ¶¶50-52. He threatened to commit mass shootings at two of these locations and reported that he had planted a bomb at the third. *Id*.

In December 2023 and January 2024, the Defendant made repeated threats against public officials and government agencies. *Id.* at ¶¶65-72. The Defendant characterized this crime spree as a "massive project." *Id.* at ¶65. He involved multiple co-conspirators in these threats, and personally chose many of the victims. *Id.* at ¶67. Notably, the Defendant committed these crimes after the FBI searched his residence and interviewed him concerning his swatting activities. *Id.* at ¶27.

## ARGUMENT

In sentencing a criminal defendant, the court must consider the advisory guidelines range and the factors set forth in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *United States v. Rosales-Bruno*, 789 F.3d 1249, 1253-54 (11th Cir. 2015). The Section 3553(a) analysis begin with the court's consideration of the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). Moreover, the sentence imposed should (1) adequately reflect the seriousness of the offense, (2) promote respect for the law, (3) provide just punishment, (4) afford adequate deterrence, (5) protect the public from future crimes of the defendant, and (6) provide the defendant with any

necessary training or treatment. 18 U.S.C. § 3553(a)(2). The court should also consider the kinds of sentences available, any pertinent policy statement, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. *Id.* at (a)(3)-(6).

**a. The Nature and Circumstances of the Offense**

As noted above, the scope, nature, and deviousness of the Defendant's criminal activity are staggering. He committed offenses in dozens of jurisdictions, and potentially risked innocent human life each and every time he engaged in "swatting." He boasted on January 20, 2023, that when he swats someone, he "usually gets the cops to drag the victim and their families out of the house and cuff them and search the house for dead bodies." Doc. 25 at ¶22. He advertised that he had created a "special scenario" for use in swatting incidents that would provoke an "extreme reaction" from law enforcement. *Id.* at ¶26. And he referred to his own swatting incidents as a "Grand Offensive," promising that "Swat teams will be dispatched." *Id.* at ¶62.

Only good fortune precluded a tragedy like the one that happened in Wichita, Kansas, in 2017, when an innocent man was killed after officers showed up at his home after receiving a hoax swatting call. The defendant in that case was a serial swatter, like Filion. In that case, the defendant called the police and reported that the resident of the targeted home had killed his father and was holding members of his family hostage at gunpoint. When officers responded to the home, they mistakenly thought that the man at the home was reaching for a weapon as he answered the

door, and they shot and killed him. *See* https://www.justice.gov/usao-ks/pr/california-man-sentenced-deadly-wichita-swatting-case (March 29, 2019). Filion's swatting calls were intentionally designed to provoke exactly this type of violent, dangerous response.

The Defendant viewed his crime spree as a form of terrorism, as he targeted governmental entities and high-ranking government officials with bomb threats and other threats of violence. The Defendant acknowledged—and seemed to revel in—the terroristic nature of his criminal conduct, writing that if he were arrested, he would be charged with "150 counts of False Emergency Reports and 23 counts of Terrorism (for swatting government officials and bomb threating schools)." *Id.* at ¶22.

In addition to the impact that the Defendant's conduct had on the recipients of his threats, his criminal conduct also caused a significant drain on law-enforcement and first-responder resources. *Id.* at ¶¶21-22. He honed his methods to cause large-scale deployment of police and emergency-services units to the targeted locations—and in many cases, that is exactly what happened. For example, with respect to Count One, when the Defendant called the Seminole County Sheriff's Office on May 12, 2023, to report that he was going to commit a mass shooting at a local religious institution, law enforcement responded and evacuated a woman and two children; they formed a perimeter and cleared the building and surrounding area. *Id.* at ¶50.

**b. The History and Characteristics of the Defendant**

The Defendant's planning, intelligence, and skills with electronic and digital technology also counsel in favor of a meaningful sentence. The Defendant himself boasted about his swatting skills as a marketing tool to attract customers to his swatting business. For example, he advertised that he charged $75 for a bomb threat or mass shooting threat, guaranteeing customers that "they will shut down the school or public location for a day." *Id.* at ¶19. And he even called in numerous swats to his own home to test his technique and mislead law enforcement. *Id.* at ¶26.

But instead of choosing to put his intelligence and skills to productive use, the Defendant repeatedly engaged in dangerous criminal behavior, even *after* FBI agents executed a federal search warrant at his home on July 15, 2023. *Id.* at ¶27. He called in a bomb threat to a public high school in Gray's Harbor County, Washington in November 2023, which led to the evacuation of the school. *Id.* at ¶41. And the Defendant, along with coconspirators, made approximately 100 swatting and threat calls in late December 2023 and early January 2024. *Id.* at ¶67. Those calls included false reports of homicide, kidnapping, and rape, and bomb threats to religious institutions and the homes of high-ranking government officials, including U.S. Senators. *Id.* at ¶66-72.

And, during the search of his home in July 2023, when he came face-to-face with federal agents, he readily lied to them about his threats to the Washington high school (Count 3) and the self-swats he had called in to his own home. *Id.* at ¶27. His

composure and denials in the midst of the execution of a federal search warrant, his efforts to improve his swatting technique, and his continued course of criminal conduct after the search warrant, demonstrate the calculated and protracted nature of his conduct.

The Defendant's youth and acceptance of guilt are certainly factors for the Court's consideration in fashioning an appropriate sentence, and the United States has seriously considered those factors as well in making its sentencing recommendation. And although it is true that the Defendant voluntarily waived venue to facilitate his plea to Counts Two through Four, the Defendant benefits greatly from this plea by reducing the chances of prosecution in several dozen jurisdictions and the accompanying risk of multiple, consecutive sentences. The requested sentence seeks to balance the Defendant's youth and acceptance of responsibility against his premediated, perilous, and protracted criminal conduct.

**c. Specific and General Deterrence**

The section 3553(a) factors that the court must consider encompass both specific and general deterrence. *See United States v. Howard*, 28 F.4th 180, 208 (11th Cir. 2022). To begin with, specific deterrence—that is, deterring this Defendant from continuing to engage in criminal conduct when he is released from prison—is a crucial consideration in this case. The Defendant's own comments throughout his crime spree indicate that he was keenly aware of the possibility of going to prison, yet committed these crimes anyway. The Defendant repeatedly acknowledged that he was breaking the law and even committing "terrorism". Doc. 25 at ¶24. He

further researched the specific statutes that he was violating, estimating that, early in his crime spree, he had already committed "150 counts of False Emergency Reports and 23 counts of Terrorism (for swatting government officials ad bomb threatening schools." *Id.* He even estimated his likely prison sentence at two years because he lived in a "leni[e]nt state." *Id.* And when confronted by the FBI, he simply lied and continued his criminal conduct unabated. *Id.* at ¶27. In light of these facts, a significant prison sentence is necessary to ensure that this Defendant learns that serious criminal conduct will be met by serious punishment.

General deterrence is also an essential consideration in fashioning a sentence in this case. The Eleventh Circuit has emphasized that "Congress, the United States Sentencing Commission, and this Court have all decided that general deterrence is a critical factor that must be considered and should play a role in sentencing defendants." *Id.* at 208. The Tenth Circuit articulated the importance of a meaningful sentence in the consideration of general deterrence in this way: "General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionately minimized." *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015).

The need to afford adequate deterrence is paramount in threats cases because of the ease with which they can be committed in the Internet area. The Defendant's own words throughout his crime spree show how attractive this anonymity can be to would-be serial swatters. The Defendant often remarked about how difficult

cybercrimes are to detect—"cybercrimes are easy to get away with if done right"—and employed numerous, easily imitable means to evade detection. Doc. 25 at ¶¶18, 23.

Unsurprisingly, given the ease of committing these crimes and the difficulty in catching the perpetrators, threats are an ever-increasing drain on law enforcement resources. Data from the Justice Department shows that in 2014, for example, the federal government charged 159 defendants with some form of threat-related offense — and the figure stayed well below 200 for the next five years. By 2019, however, the number of threat-related defendants had spiked to 243, and it has stayed high; 242 people were charged federally in threat cases in 2022, according to Justice Department figures, and 222 were charged in 2023. Overall, the most recent five-year period saw the number of federally charged threat cases rise 47 percent compared with the preceding five-year period. *See* https://www.washingtonpost.com/national-security/2024/01/12/threats-swatting-fbi-justice-prosecutions.

The United States has seen a corresponding increase here in the Middle District of Florida, with the U.S. Attorney's Office prosecuting numerous threat cases. Between 2023 and February of 2024, this District alone charged at least 27 threat-related cases, none of which are comparable to the Defendant's 375-threat spree. *See* U.S. Attorney Highlights Recent Prosecutions of True Threats, https://www.justice.gov/usao-mdfl/pr/us-attorney-highlights-recent-prosecutions-true-threats-and-hate-crimes-cases-will. As one example, in August 2024, defendant Stephen Thorn was sentenced to a term of imprisonment of five years after pleading

guilty to making five threatening phone calls in a single day to a federal judge's chambers. *United States v. Thorn*, 8:23-cr-361-WFJ-CPT, Docs. 65, 68. Significant sentences like that imposed in the Thorn case are necessary to provide adequate deterrence.

**d. Respect for the Law**

The sentence imposed must also promote respect for the law. The Defendant's conduct throughout this case shows a profound disrespect for the law, law enforcement, and his fellow citizens. As explained throughout this Memorandum, the Defendant was keenly aware of the laws he was violating and the specific punishments he would face, yet he continued his criminal conduct undeterred. Moreover, in a very real sense, law enforcement was a victim of each and every one of the 375 crimes that the Defendant committed. In some cases, law enforcement officers were targeted directly, with the Defendant causing a police response to their residences. But in every case, the purpose of the Defendant's crimes was to send law enforcement into dangerous situations under false pretenses, not only wasting resources but putting the responding officers in danger. The Defendant's course of conduct shows a disturbing lack of respect for the law, which must be met with a significant sentence of imprisonment.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court impose a sentence of 37 months in prison, followed by three years of supervised release.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By: */s/ Daniel J. Marcet*
Daniel J. Marcet
Assistant United States Attorney
Florida Bar No. 0114104
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: Daniel.Marcet@usdoj.gov

**U.S. v. Filion** **Case No. 6:24-cr-261-CEM-LHP**

## CERTIFICATE OF SERVICE

I hereby certify that on February 4, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Daniel W. Eckhart
David R. Bigney

*/s/ Daniel J. Marcet*
Daniel J. Marcet
Assistant United States Attorney
Florida Bar No. 0114104
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: Daniel.Marcet@usdoj.gov